UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | No. 6:15-CR-21-GFVT-HAI-1 |
| ) | |
| v. ) | RECOMMENDED DISPOSITION |
| ) | |
| KENNETH MICHAEL HATTON, ) | |
| ) | |
| Defendant. ) | |

*** *** *** ***

On referral from District Judge Van Tatenhove (D.E. 336), the Court considers reported violations of supervised release conditions by Defendant Kenneth Michael "Mike" Hatton.

Judge Thapar entered judgment against Defendant in September 2016 on Defendant's guilty plea to conspiracy to distribute 100 grams or more of a heroin mixture. D.E. 200. Defendant was sentenced to 130 months of imprisonment (below his Guidelines Range of 151 to 188 months) followed by eight years of supervised release. Defendant was released on August 16, 2023. He was supervised out of the Cincinnati Probation Office.

I.

On June 9, 2025, the United States Probation Office ("USPO") issued the Supervised Release Violation Report ("the Report") that initiated these proceedings. The Report charges three violations. The Report was then followed by a July 25, 2025 Addendum charging three additional violations. Defendant ultimately stipulated to Violation #5 and the government ultimately moved to dismiss the other five violation allegations.

By way of background, the Report explains:

On September 25, 2023, Hatton requested to be referred for mental health counseling to address issues relating to anxiety and depression following his release from custody. Shortly after receiving the Court's approval of the modification request, he was referred to begin attending both mental health and substance abuse counseling through IKRON, Inc., a contracted treatment provider in the Cincinnati area. He has been attending outpatient counseling, as well as random drug testing at IKRON ever since. Shortly after beginning treatment, Hatton began providing multiple positive drug tests for the use of marijuana in October, November and December of 2023. These violations were reported to the Court in the report dated March 15, 2024.

Over the next several months, Hatton was compliant with the conditions, eventually securing verifiable employment and appeared to be progressing in treatment. However, in August 2024 he submitted two positive drug tests for the use of marijuana. Then on November 7, 2024, he submitted a positive drug test for the presence of oxycodone. Finally, a transdermal sweat patch that had been placed onto Hatton on January 17, 2025 and removed on January 29 was determined to be positive for the presence of marijuana and Hatton admitted to the ongoing illegal use of prescription opiates over the course of several months. These violations were reported to the Court in a report dated February 26, 2025.

As a result, Hatton was directed to enter into a residential treatment program, which he did on February 6, 2025 at Sea Crest Detox and Residential Treatment program in Willard, Ohio. He successfully completed their program on March 7, 2025 and was referred back to outpatient counseling at IKRON upon his return to Cincinnati. This return to outpatient counseling was delayed however, when Hatton reported a mysterious single vehicle accident just days after returning to Cincinnati, which resulted in significant injuries, including broken ribs, a broken collar bone and various other lacerations, contusions and broken bones. Hatton claimed that he was the operator of a vehicle that had run off the road and struck a tree in the city of Cincinnati, but 911 emergency services were never called, no police report was filed and he was driven to the hospital by a 3rd party witness/Good Samaritan, whose name and contact information he did not know. Due to his injuries, he was not able to return to IKRON until April 16.

In addition to [the violations alleged in the Report], it should also be noted that a transdermal sweat patch was placed onto Hatton on April 9, 2025 and removed on April 25, 2025. At the time that the patch was removed, it bore signs of having been tampered with and/or removed. An adhesive, clear overlay that covers the transdermal patch, as well as an area of skin approx. 4" x 5", was pulled up at one corner allowing for the patch to be easily removed and reinserted. Hatton had previously been advised that the overlay should not come loose without intentionally tearing or pulling it, but if something were to happen to cause it to become loose, he was directed to contact this officer immediately so it could be removed and a new one put on in its place. Hatton did not report any issues with

the patch until this officer removed it. The patch was submitted for laboratory analysis, which reported back on May 9, 2025 that the patch contained a "Quantity Not Sufficient for Analysis" for all of the testable illegal substances.

Although the Report's timeline of the alleged violations is a bit difficult to follow, the Court has established on the record the following sequence of events. The probation officer placed a sweat patch on Hatton on April 25, 2025. On May 7, the patch was removed and sent for testing. Meanwhile, Hatton submitted a urine specimen on May 13, 2025, that tested positive for marijuana upon instant testing. During that May 13 visit, Hatton signed a written admission that he had used marijuana on April 30. The sweat patch arrived at the lab on May 23, an unusually long transit time. The subsequent May 29 report indicated positive results for cocaine, oxycodone, and THC for the patch that had been removed on May 7. Meanwhile, Hatton submitted another urine sample on May 27, 2025. A lab report issued June 2 indicated the presence of oxycodone and oxymorphone in that May 27 sample. Finally, the probation officer ordered Hatton to appear on June 5, 2025, for random drug testing, but Hatton did not appear.

Violation #1 charges a Grade C violation of the condition that prohibits unlawful use and possession of a controlled substance. This violation is based on (1) Defendant's admitted April 30 marijuana use, (2) the use of cocaine, oxycodone, and marijuana detected from the sweat patch applied on April 30, and (3) the May 27 urine specimen that was positive for oxycodone and oxymorphone.

Violation #2 charges a Grade C violation of the condition that requires that Defendant submit to drug testing at the direction of the probation officer. This is based on the allegation that Defendant was ordered to appear for testing on June 5, but failed to report.

Violation #3 charges a Grade B violation of the condition that prohibits commission of another federal, state, or local crime. It alleges Hatton "illegally possessed marijuana, cocaine,

3

oxycodone and oxymorphone." Under the Sixth Circuit's ruling that drug use necessarily entails possession, and with Hatton's prior drug convictions, possession of marijuana, cocaine, oxycodone or oxymorphone violates 21 U.S.C. § 844(a), a Class E Felony.

Hatton was arrested, and, on July 23, 2025, Magistrate Judge Smith conducted an initial appearance in Covington under Rule 32.1. D.E. 340. The Court set a final hearing following a knowing, voluntary, and intelligent waiver of the right to a preliminary hearing. At the initial appearance, the United States made an oral motion for interim detention; Defendant did not argue for release. *Id*. Based on the heavy defense burden under 18 U.S.C. § 3143(a), the Court remanded Defendant to the custody of the United States Marshal. *Id*.

On July 25, the USPO issued an Addendum to the Report, which charges three additional violations. The Addendum explains that, after the July 23 initial appearance, Defendant submitted a urine sample that tested positive, upon instant testing, for marijuana, methamphetamine, and MDMA. Defendant signed an admission that he had used marijuana and methamphetamine within the prior three days. Subsequent lab testing yielded positive results for marijuana and meth, but negative for MDMA.

Violation #4 charges a Grade C violation of the condition that prohibits unlawful use and possession of a controlled substance. This violation is based on Defendant's admitted use of marijuana and meth just prior to his arrest and initial appearance. As noted, final lab results, which were not obtained until August 7, were negative for MDMA.

Violation #5 charges a Grade B violation of the condition that prohibits commission of another federal, state, or local crime. It alleges Hatton "illegally possessed both marijuana and methamphetamine." Under the Sixth Circuit's ruling that drug use necessarily entails possession,

and with Hatton's prior drug convictions, possession of marijuana and methamphetamine violates 21 U.S.C. § 844(a), a Class E Felony.

Finally, Violation #6 charges a Grade C violation of the condition that requires Defendant to report to the Probation Office when directed. According to the Addendum,

> Kenneth Hatton was instructed to report to this officer on Friday, July 18, 2025. Hatton left this officer a voicemail two days prior acknowledging the appointment and confirming that he would report as directed. However, he failed to report to this officer as instructed. Following the initial appearance on July 23, 2025, Hatton admitted to U.S. Probation Officer Jesse Sizemore of the Covington Probation Office that he had intentionally failed to report to this officer on July 18.

The Court conducted an initial appearance on the Addendum on July 28. D.E. 343. Defendant, after being sworn, competently, knowingly, voluntarily and intelligently waived his right to a preliminary hearing. And he was remanded to the Marshal's custody.

At the final hearing on August 13, 2025, Defendant was afforded all rights due under Rule 32.1 and 18 U.S.C. § 3583. D.E. 344. Defendant competently entered a knowing, voluntary, and intelligent stipulation to Violation #5. *Id*. He adopted his signed admission of July 23 which says he had used marijuana on July 23 and methamphetamine on July 20. Thus, for purposes of Rule 32.1 proceedings, Defendant admitted the factual basis for Violation #5 and the government established Violation #5 under the standard of section 3583(e). The government moved to dismiss the other five violations.

## II.

The Court has evaluated the entire record, the Report, Addendum, and accompanying documents, and the sentencing materials from the underlying Judgment. Additionally, the Court has considered all the section 3553 factors imported into the section 3583(e) analysis.

Under section 3583(e)(3), a defendant's maximum penalty for a supervised release violation hinges on the gravity of the underlying offense of conviction. Defendant pleaded guilty to a Class A felony, conspiracy to distribute 100 grams or more of a heroin mixture. *See* 21 U.S.C. §§ 841, 846. Such a conviction carries a five-year maximum period of incarceration upon revocation pursuant to 18 U.S.C. § 3583(e)(3).

The Policy Statements in Chapter 7 of the Sentencing Guidelines provide advisory imprisonment ranges for revocation premised on criminal history (at the time of original sentencing) and the "grade" of the violation proven. *See United States v. Perez-Arellano*, 212 F. App'x 436, 438-39 (6th Cir. 2007). Under section 7B1.1, Defendant's admitted conduct constitutes a Grade B violation. Given Defendant's criminal history category of VI (the category at the time of the conviction in this District) and Grade B, Defendant's range, under the Revocation Table of Chapter Seven, is 21 to 27 months. USSG § 7B1.4(a).

A court may re-impose supervised release, following revocation, for a maximum period that usually subtracts any term of incarceration imposed due to the violation. *See* 18 U.S.C. § 3583(b) & (h). Defendant's drug trafficking conviction carries no maximum term of supervised release. *See* 18 U.S.C. § 3583(h); 21 U.S.C. 841(b)(1)(C).

### III.

At the final hearing, the government requested a bottom-of-the Guidelines revocation penalty of 21 months' incarceration, to be followed by continuation of the existing term of supervised release. The defense requested drug treatment in lieu of revocation, with supervision to continue to the current termination date of August 15, 2031. Otherwise, the parties did not request any new conditions of release.

The government found certain mitigating factors that would support a bottom-of-the-Guidelines sentence. The first is that Defendant signed a written admission to using marijuana and meth when confronted with the instant test results. Although he did not admit to MDMA use indicated by the instant test, the later lab test results vindicated the accuracy of his admission. Additionally, Defendant had a period of compliance with supervision upon his release. Defendant did well to approach his probation officer when he slipped back into drug use. And he performed admirably in inpatient treatment.

However, the government did not find a below-Guidelines sentence appropriate. Defendant has a criminal history category of VI. And the underlying conviction is for heroin trafficking, with an aggravating quantity and a prior-felony enhancement. Defendant's criminal history includes an armed robbery in a residence (admittedly when Defendant was only 18 years old). This history of violence, and the sheer size of Defendant's criminal history, indicated a potential for dangerousness which counsels in favor of protecting the public and deterring criminal conduct through incarceration. Defendant's criminal history also includes three state parole violations and a state probation violation. The government also stressed that Defendant had committed new felony conduct. And the government noted that meth use impedes a person's rationality and impulse control.

The government also considered the breach of the Court's trust to be aggravated because Defendant was given chances prior to the USPO seeking revocation. One can see in the record the three noncompliance summaries filed in September 2023, March 2024, and February 2025. D.E. 321, 333, 334. Defendant continued to use drugs during his supervision. And, although he sought and received help, he ultimately made a series of bad choices that led to Violation #5.

In arguing for treatment instead of revocation, the defense argued the government was placing too much weight on Defendant's criminal history. The armed robbery happened 30 years ago. Defendant is now a different, nonviolent person, albeit one with a drug addiction. All the violation conduct stemmed from this addiction.

The defense emphasized how well Defendant had done in inpatient treatment at Sea Crest. In fact, the defense produced a letter dated August 5 from the admissions coordinator at Sea Crest. It says Defendant is accepted to receive treatment there again, including inpatient detox and aftercare programs. The defense indicated Sea Crest was holding a spot for Defendant, depending on the outcome of these proceedings.

The problem is that, immediately following his successful completion of the Sea Crest program, Defendant experienced the car wreck. In addition to suffering broken bones, he now has a noticeable scar above his eye. Defendant's pain and his embarrassment related to how he looks contributed to his "stumbling." The defense said Defendant is "self-medicating." He hurts and does not feel good about himself. The wreck took away the "fresh start" he had when leaving rehab.

According to the defense, Defendant is motivated to stay sober. And Sea Crest is enthusiastic about having him back. Defendant had also been working as a forklift operator prior to the accident, and as a truck driver thereafter. Defendant had not previously worked a normal job, and his employment had become a "point of pride" for him.

Defendant addressed the Court. First, he stressed he was not the same person at 48 as he was at age 18. He said he took the car accident "really hard." Car wrecks were a "phobia" that ended up happening to him. He said he had seen "a different world" the past two years as someone with legitimate employment. He also has new friends and new support from his family. Defendant

said that he was given a Percocet prescription after the wreck. And he took the pain pills only as prescribed. But he did not feel clean and sober in taking it. The pain and partial paralysis of his face led to a "weak moment" when he got back on illegal drugs. He insisted he was not under the influence when the wreck occurred.

### IV.

To determine an appropriate revocation term of imprisonment, the Court has considered all the statutory factors imported into the section 3583(e) analysis, as well as the Guidelines Range.

Congress mandates revocation in a case of this nature. By statute, the Court must revoke Defendant because he possessed a controlled substance. *See* 18 U.S.C. § 3583(g)(1); *see also United States v. Crace*, 207 F.3d 833, 836 (6th Cir. 2000) (equating use with possession).

The only exception would be if a suitable treatment option, or Defendant's record of involvement in treatment, warranted treatment in lieu of revocation under 18 U.S.C. § 3583(d). *Crace*, 207 F.3d at 835. The defense asked the Court to impose treatment in lieu of revocation. However, the record counsels in favor of revocation. The violation conduct is too serious, especially when considered in the context of the entire record. Defendant's prior state parole and probation violations reveal a person who is resistant to compliance. Defendant's history of drug use and trafficking make him dangerous. And taking meth (in the context of the fentanyl outbreak) is like playing Russian roulette. Further, the inexplicable single-vehicle accident is troubling. Because of the acute need to protect the public and deter criminal conduct here, treatment instead of revocation is not supported by the record. Treatment is available, but the record indicates it is neither suitable nor can be expected to be effective because Defendant's substance abuse continued swiftly after completing inpatient treatment at Sea Crest.

The presence of a Grade B violation also means that revocation is recommended under the Guidelines. U.S.S.G. § 7B1.3(a)(1) ("Upon a finding of a Grade A or B violation, the court shall revoke probation or supervised release."). Even if revocation were not mandatory, revocation would be appropriate in this case due to the nature of the violations.

One factor concerns the nature and circumstances of Defendant's conviction. *See United States v. Johnson*, 640 F.3d 195, 203 (6th Cir. 2011) (explaining that this sentencing factor focuses upon the original offense rather than the violations of supervised release). According to the PSR, Defendant was a middle-man for moving heroin from Cincinnati to Pulaski County. He was responsible for moving three to ten kilograms. This was a Class A felony based on the drug quantity alone, but it was also enhanced by a prior drug felony. The underlying conviction was significant and dangerous.

The Court next considers Defendant's history and characteristics. Defendant carries his criminal history category of VI, indicating a potential for dangerousness. This history includes state probation and parole violations. While on federal supervised release, he continued to use drugs. But he chose to admit his drug use to his probation officer and even sought help. By all accounts, he performed remarkably well at Sea Crest. But, following the accident, he engaged in a series of serious violation conduct, including committing federal felony drug possession.

Another factor concerns the need to deter criminal conduct and protect the public. As noted, Defendant's drug use makes him dangerous. And his extensive criminal history demonstrates a need for protection and deterrence.

Another factor focuses on opportunities for education and treatment. The record here is unique in that Defendant completed inpatient treatment earlier this year. And now, the same treatment center is willing and waiting for him to return. The defense told the Court that Defendant

was willing to pay for the Sea Crest program himself. The Court hopes the motivation that Defendant claims to have will continue beyond his incarceration and that he will continue to seek treatment. The Probation Office's resources will also remain available as Defendant still has several years of supervision before him.

The Guidelines suggest that the ***primary*** wrong in the supervised release context is the violation of the Court's trust by an offender. The particular conduct is an important but secondary issue. *See* Guidelines 7 Pt. A(3)(b) ("[A]t revocation the court should sanction primarily the defendant's breach of trust, while taking into account, to a limited degree, the seriousness of the underlying violation and the criminal history of the violator."). The Court must impose a sentence that is sufficient, but not greater than necessary, to address Defendant's breach of trust and the other statutory goals imported into section 3583(e). This is a difficult case in that we have a Defendant who sought help, who performed well in treatment, but who then had a car wreck and fell off the wagon into a series of unlawful behaviors. There is a real breach of the Court's trust, but with significant mitigating factors. Accordingly, the undersigned will recommend a revocation sentence of 18 months, followed by continuation of the existing supervision term

One factor the Court must consider is the need to avoid unwarranted sentencing disparities. This factor is usually addressed by imposing a within-Guidelines sentence. Here, the Court recommends a sentence below the Guidelines Range of 21 to 27 months. When varying from the Range, the Court must provide an adequate explanation and "'consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.'" *Johnson*, 640 F.3d at 205 (quoting *Gall v. United States*, 552 U.S. 38, 50 (2007)). The Court must state "'the *specific reason* for the imposition of a sentence different from that described [in the applicable Guidelines or policy statements.]'" *Id.* (quoting 18 U.S.C. § 3553(c)(2)).

Here, 18 months is enough. Defendant is someone who has made significant progress. It matters that Defendant has found joy and meaning in legitimate employment. It matters that he has gained family support and found new friends. It matters that he performed so well at Sea Crest they are eager to have him back. He also readily admitted the violation. Additionally, the fact that Defendant's supervision will last another six years provides an additional layer of protection and deterrence.

Based on the foregoing, the Court **RECOMMENDS**:

1. That, upon his stipulation, Defendant be found guilty of Violation #5.

2. That, upon the government's motion, Violations #1, 2, 3, 4, and 6 be dismissed.

3. Revocation with a term of imprisonment of 18 months, followed by the remainder of his existing supervision period, set to expire August 15, 2031.

The Court directs the parties to 28 U.S.C. § 636(b)(1) for appeal rights concerning this recommendation, issued under subsection (B) of the statute. *See also* 18 U.S.C. § 3401(i). As defined by § 636(b)(1), within **fourteen days** after being served with a copy of this recommended decision, any party may serve and file written objections to any or all portions for consideration, de novo, by the District Court. Failure to make timely objection consistent with the statute and rule may, and normally will, result in waiver of further appeal to or review by the District Court and Court of Appeals. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Wandahsega*, 924 F.3d 868, 878 (6th Cir. 2019).

Defendant's right of allocution under Rule 32.1 is preserved, as reflected in the record. Any waiver should comport with the Court's standard waiver form, available from the Clerk. Absent waiver, the matter will be placed on Judge Van Tatenhove's docket upon submission. If

Defendant chooses to waive allocution, he **SHALL** do so on or before the deadline for filing objections.

This the 14th day of August, 2024.

Signed By:
*Hanly A. Ingram*
United States Magistrate Judge